UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN COOLEY and COOLEY & CO. LTD.
                    Plaintiffs,

-against-

PENGUIN GROUP (USA) INC., DK PUBLISHING, INC. an affiliate of PENGUIN GROUP (USA) INC., DORLING KINDERSLEY LIMITED. an affiliate of PENGUIN GROUP (USA) INC., GETTY IMAGES, INC., CORBIS CORPORATION, RGB VENTURES LLC D/B/A SUPERSTOCK and LOUIS PSIHOYOS,

                    Defendants.

Index No. 12-CV-0001

## DECLARATION OF BRIAN COOLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BRIAN COOLEY, pursuant to 28 U.S.C. § 1746, declares under penalties of perjury that the following is true and correct:

1. I am an individual plaintiff in this matter and a co-owner of plaintiff Cooley & Co., Ltd. — a Canadian company in the business of creating three-dimensional sculptures, primarily dinosaurs, for use or sale by or to its clients (collectively, "**Plaintiffs**"). I submit this declaration, to accompany the declaration of my counsel Sam P. Israel and supporting memorandum of law, along with the attached exhibits in support of the Plaintiffs' Motion for Partial Summary Judgment against the only defendant remaining in this action, Louis Psihoyos (the "**Defendant**" or "**Psihoyos**").

2. To dispel any misapprehension about the circumstances behind the creation of the artworks I claim to have been infringed, namely the *Therizinosaur* and *Segnosaur Embryo* sculptures, following are my clear recollections of the underlying events.

3.     Sometime in the fall of 1995, I began working on creating historically-accurate, three-dimensional sculptures of a broken-open dinosaur egg with an exposed Segnosaur embryo and an oblong Therizinosaur egg (the "Works").

4.     Due to the general lack of information about these specific fossils at that time, I spent over 350 (three hundred and fifty) hours researching, analyzing data, and reconstructing three-dimensional skeletons of what fossils of baby dinosaurs would have looked like in real life. The process for creating the sculptures was very intricate and time-consuming: I reviewed paleontological studies, measured the fossils, created rough sketches of the creatures before moving on to shaping the models and applying the fine details in order to create historically-accurate *Therizinosaur* and *Segnosaur Embryo* sculptures. I then sculpted over those skeletons with clay, making rubber molds of the clay sculptures, casting the sculptures into a permanent, resinous material, assembling the pieces, removing all seams, covering the skeletons with a realistic, lizard-like rubber skin and painstakingly painting both sculptures. The technique of creating and applying the rubber skin alone took days of development. Similarly, a great deal of time went into determining the best materials and techniques to employ for creating the eggshells. Attached as Exhibit 5 is a true and correct copy of an image showing my process of creating the *Segnosaur Embryo* sculpture; Exhibit 6 consists of true and correct copies of the diagrams and paleontological material which aided my creation process.

5.     Although Psihoyos has claimed during these proceedings that my *Therizinosaur* sculpture was somehow a derivative work based on his photographs of the fossil, I never saw these purported photographs, and they would not have served as the bases for my creation.

6.     In fact, I traveled to Boulder, Colorado, in order to inspect, photograph, and measure a recently-discovered dinosaur egg fossil which was to be the subject of my *Therizinosaur* sculpture. Attached as Exhibit 8 is a true and correct copy of my receipts and travel expenses from that trip; Exhibit 7 is a true and correct copy of a photograph which I took of the Therizinosaur fossil in its raw state.

2

7. In sculpting the Works, I relied on my imagination, scientific knowledge, training, education, artistic abilities, and years of experience as a paleoartist. In fact, over the past thirty years of my life and career as a paleoartist, I have been creating realistic, life-sized dinosaur sculptures which have been displayed in museums and traveling exhibits around the world, and have appeared in numerous scholarly and lay publications, including on the covers of three separate issues of *National Geographic*.

8. By the time a photographer (Psihoyos) arrived at my facility in Canada to take photographs of the Works for *National Geographic*, the sculptures were already completed.

9. Before initiating this action, I registered the oblong sculpture as "*Therizinosaur*" (Registration No. VA1-793-313) and the broken-open egg sculpture as "*Segnosaur Embryo*" (Registration No. VA1-793-315) with the U.S. Copyright Office, and assigned ownership of the copyrights and all attendant rights to my company, Cooley & Co. Ltd. by way of written agreement. Attached as Exhibit 1 is a true and correct copy of the written assignment; Exhibit 2 consists of true and correct copies of the registration certificates; Exhibit 4 portrays the sculptures in two dimensional form and as featured in the May 1996 issue of *National Geographic*.

10. As I understand it, Psihoyos was hired by the National Geographic Society ("NGS") in order to photograph my works for the May 1996 issue of *National Geographic*—that is, to cast them in a medium suitable for publication of the magazine. I contributed to this process as well, by creating an egg yolk-like mixture and continuously applying it to the sculptures in order to create a glossy, lifelike appearance for the photographs. I even chipped off small fragments of the egg from the *Therizinosaur* sculpture in order to reveal the tip of the baby dinosaur's nose which obscured the angle at which Psihoyos wanted to photograph it. (I can even point out the exact location where I broke off the fragments as the breaks left unique tool marks on the sculpture.) In fact, *nothing else appears in the photographs other than my Works, without which Psihoyos' "copyrighted" photographs would consist of blank frames.*

11. In order to facilitate the publication of my copyrighted Works in *National Geographic*, I entered into an agreement with NGS (the "NGS-Cooley Agreement"), in which I agreed to a temporary transfer of ownership of my copyrights to NGS for one year from the publication of the May 1996 issue of the magazine. After one year, the copyrights would revert to me with three limited exceptions. A true and correct copy of the NGS-Cooley Agreement is appended as Exhibit 3.

12. I understand that Psihoyos claims that NGS possessed the copyrights to my Works from the moment I created them. This is blatantly false. NGS did not create the Works, I did (and I was not employed by NGS at the time). Unlike Psihoyos—who apparently stated at his deposition that he worked for NGS for 17 years and received a salary at various points of his career—I was never a salaried employee of NGS. The NGS-Cooley Agreement even states that I was "undertaking this assignment as a free-lance contractor and the National Geographic Society will not be responsible for . . . [my] health, safety, or property . . . ." *See* Ex. 3. Moreover, how could I *transfer the copyrights to NGS if I never possessed said copyrights from the beginning?*

13. Consistent with my negotiations with Chris Sloan (NGS's art director at the time) leading up to the formation of the NGS-Cooley Agreement, the temporary grant of copyrights to NGS was aligned with the Society's intent to use the Works in association with the story about dinosaur eggs (which was published in the May 1996 issue) without encroaching on my preexisting copyrights. I understand that Mr. Sloan and a representative from NGS both confirmed this during their respective depositions.

14. I further agreed to three limited qualifications to the reversion of my rights. I agreed to grant NGS a perpetual right to use the Works for educational purposes and for its own purposes upon the payment of a fee. Unfortunately, I have come to learn that the written document is unclear with respect to whether said "fee" must be paid to me or to NGS. I construed this language to refer to a prospective payment to me, but irrespective of who receives the "fee," Psihoyos never paid *anybody* for such right. More importantly, the NGS-Cooley Agreement cannot be read so as to grant NGS a perpetual right to permit unfettered commercial distribution of the Works

4

without my authorization and after the copyrights reverted back to me. This would render my reversionary copyrights a nullity and render meaningless any bargained-for consideration that I gave up for these rights.

15. Considering the scale of investment of time, effort, and dedication to the creation of the Works, it is absurd that I would have freely relinquished my copyrights even for such prominent publication as the *National Geographic*. Unequivocally, it was my understanding during the negotiations and execution of the agreement that no third party, for-profit entity would possess unlimited rights to distribute and profit from my Works without my authorization.

16. Although Psihoyos apparently relies on the limited exceptions in my agreement with NGS as a defense to his unlawful actions, the Defendant was not present during my negotiations with NGS or at the time that I signed the written document. And obviously Psihoyos is not a party to the NGS-Cooley Agreement. That Psihoyos undertook to interpret my arrangement with NGS without any prior knowledge of it and in a manner that would ostensibly deprive me of my copyrights in the Works is both dishonest and contrary to the language in the written document.

17. But Psihoyos *knew that I created the Works from the moment he saw them*. Yet, the Defendant failed to so much as inquire about my copyrights in the Works, much less seek my authorization to make other derivative material or distribute copies of the Works to third parties.

18. In or about the fall of 2011, I discovered that copies of my Works were featured on the covers of and in three books published by DK Publishing, Inc. and its affiliate, Dorling Kindersley Limited (both are owned/operated by Penguin Group (USA) Inc.), apparently having licensed images of *Therizinosaur* and *Segnosaur Embryo* sculptures from Getty Images Inc. and Corbis Corporation. My subsequent investigation revealed that Psihoyos provided photographs of my Works to the aforesaid entities without my authorization and continued to license, publish, and distribute the Works in violation of my exclusive rights to do so as the copyright owner.

19.     It is true that I was present during the photo shoot, and in fact I collaborated with Psihoyos on creating the images. But while I authorized the Defendant to make photographs of my Works, that authorization extended only to the purpose of the project—that is, featuring the Works in *National Geographic*. This is why Psihoyos was in my studio in Canada and the reason I let him take photographs of the Works. I never contemplated that granting him permission to take said photographs would result in the Defendant's infringing activities.

20.     Insofar as Psihoyos claims to have had a similar agreement with NGS, I had no knowledge about the agreement prior to this action. Nevertheless, having read the document, I saw nothing that expressly stated that NGS gave Psihoyos copyrights in the Works—that is, even if NGS did temporarily own the copyrights in the Works at the time, NGS never gave them to Psihoyos. Furthermore, I believe that the mere act of taking a photograph of the sculptures does not (and should not) automatically vanquish my copyrights in them.

21.     Even if NGS transferred copyrights *in the photographs* to Psihoyos, my rights would not have been violated if Psihoyos requested my authorization before using the Works and enabling others to publish, display, and create reproductions or other material deriving from the Works.

22.     Consistent with my agreement with NGS, I understand that I still possess the exclusive rights to reproduce, prepare derivative material from, display and distribute the Works, which rights were violated when Psihoyos exceeded the scope of his authorization to photograph the Works for *National Geographic*.

23.     Remarkably, during the course of this litigation, Psihoyos made certain statements contesting not just ownership, but my authorship of the artworks at issue, purporting himself to be the sculptor, photographer, and ostensible master-mind behind *National Geographic's* publications. Psihoyos made these statements notwithstanding my education, paleontological training, and reputation as a dinosaur sculptor and despite the fact that he had no role whatsoever in creating the sculptures—indeed, they were fully finished before we even met. A veteran litigant of copyright

infringement claims who prides himself on making a living from statutory damages and settlement proceeds from these lawsuits, Psihoyos should be especially sensitive to infringing on other artists' copyrights. Yet, with respect to my original artworks, the Defendant did not hesitate to provide reproductions to anyone who would pay for them without seeking my authorization even though he *knew* that I created them.

24. Psihoyos did not even bother to designate that his photographs were based on and derivative of my artworks on his registration statements to the U. S. Copyright Office.

25. And while Psihoyos claims that he *sometimes credited* me as the model maker when he distributed the photographs to various commercial entities, if he was really concerned about my copyrights, Psihoyos would have sought my authorization before undertaking unauthorized dissemination of my Works.

26. As a copyrights owner, I am undoubtedly entitled to control the use of my original sculptures and charge licensing fees for reproducing, displaying or distributing the Works.

27. But since the inception of this action, I have discovered that a veritable merchandising campaign has evolved from Psihoyos' unauthorized reproductions of the Works. And although the Defendant was ordered to stop the use, publication and commercial exploitation of the photographs of my Works, as well as apply his best efforts to stop the foregoing acts, I discovered these unauthorized reproductions after the Order was issued. Exhibit 9 consists of true and correct copies of letters I caused my counsel to prepare and transmit to various vendors demanding that they cease and desist from distributing unauthorized copies of my Works.

28. Artistic control is essential to my business, good will and reputation. Most of my business is generated as a result of referral or from seeing my Works exhibited in prominent museums, exhibits, and publications. If any third party is allowed to flood the world with unauthorized imitations of my Works, the value of the sculptures will plummet, as will my good will and reputation.

29. Just as important are licensing fees that I earn from granting permission to clients to exhibit my Works. In the past, I have collected thousands of dollars in licensing fees for allowing one of my sculptures to be photographed and included in a single publication.

30. To this end, I respectfully submit that I am entitled to licensing fees and monetary damages resulting from Psihoyos' unauthorized use, reproduction, distribution and sale of images of my copyrighted sculptures. At a minimum, Psihoyos should be permanently restrained from to continuing to flood the world with copies of my original artworks and other derivative material which proliferated due to Defendant's actions without my authorization.

31. I further submit that Psihoyos' infringements were willful in that Psihoyos at all relevant times knew that I created the Works and that his conduct was infringing on my rights as the copyrights owner. And while ostensibly receiving fees from various stock photography agencies and third parties (including former, above-captioned defendants in this action), who licensed photographs of the Works, Psihoyos also encouraged, facilitated and induced others to publish, distribute and reproduce the Works, thereby further infringing on my copyrights. What is more, the Defendant apparently failed to comply with the Order requiring him to use his best efforts to stop unauthorized exploitations of my Works. The foregoing conduct is clearly indicative of the Defendant's reckless disregard for my copyrights.

32. Consequently, and in accordance with the foregoing, I respectfully request that this Court grant the Plaintiffs' Motion for Partial Summary Judgment, together with whatever other relief that this Court deems just proper and equitable.

Dated: June 28, 2011

Brian D. Cooley